# United States Court of Appeals
## For the First Circuit

No. 15-1858

CORNWELL ENTERTAINMENT, INC., f/k/a Cornwell Enterprises, Inc.,
f/k/a CEI Enterprises, Inc.; PATRICIA D. CORNWELL;
STACI GRUBER, PH.D.,

Plaintiffs, Appellants,

v.

ANCHIN, BLOCK & ANCHIN, LLP; EVAN SNAPPER,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Joan A. Lukey, with whom Stuart M. Glass, Justin J. Wolosz, Kevin C. Quigley, and Choate Hall & Stewart LLP were on brief, for appellants.
Carter G. Phillips, with whom Eric D. McArthur, Jennifer J. Clark, Christopher A. Eiswerth, Jack W. Pirozzolo, Sidley Austin LLP, Thomas R. Manisero, and Wilson, Elser, Moskowitz, Edelman & Dicker, LLP were on brief, for appellees.

July 18, 2016

**BARRON**, **Circuit Judge**.  This appeal arises from a district court's decision to reverse a jury's $51 million award to a well-known crime novelist, her spouse, and her corporation against their former business managers.  We affirm in part, reverse in part, and remand.

## I.

The following facts are not in dispute.  Patricia Cornwell is a well-known crime novelist who resides in Massachusetts.  In January 2005, Cornwell hired Anchin, Block & Anchin, LLP ("Anchin"), an accounting firm based in New York, to provide "concierge business management" services for her and her corporation, Cornwell Entertainment, Inc. ("CEI").  Eventually, Anchin was hired to provide those same services to Cornwell's spouse, Staci Gruber.

Over the next four-and-a-half years, Anchin and one of Anchin's principals, Evan Snapper, handled a wide array of tasks for Cornwell, Gruber, and CEI.  But on August 31, 2009, Cornwell, Gruber, and CEI terminated their relationship with Anchin.  Several weeks later, on October 13, 2009, they initiated this suit against the defendants, Anchin and Snapper, in federal district court in Massachusetts based on diversity jurisdiction.  After several amendments to the complaint and various pre-trial motions, the parties proceeded to trial on three New York state-law claims:

negligent performance of professional services, breach of contract, and breach of fiduciary duty.

At trial, the plaintiffs presented several theories of liability in support of each of the three claims. The plaintiffs alleged that the defendants had mismanaged the plaintiffs' finances and investments by keeping shoddy records, carelessly preparing tax returns, misplacing funds, and choosing investments that did not fit the plaintiffs' stated risk tolerance. The plaintiffs also alleged that the defendants mismanaged a contract the plaintiffs had with the company NetJets for fractional ownership of a private airplane.

In addition, the plaintiffs alleged that the defendants had mismanaged several real estate transactions that the plaintiffs had engaged in, including the plaintiffs' purchase of a condo in the Renaissance building in Florida in the winter and spring of 2006, rental of an apartment on Fifth Avenue in New York City in the spring and summer of 2006, and purchase and renovation of a home on Garfield Road in Concord, Massachusetts from 2005 through 2007. The plaintiffs further alleged that the damages resulting from the defendants' mismanagement of those real estate transactions included losses Cornwell incurred when, due to the lack of an appropriate space in which to write, she missed her deadline to submit her novel, "Book of the Dead." Finally, the plaintiffs alleged that within weeks of the commencement of this

lawsuit, the defendants falsely reported to the United States Department of Justice ("DOJ") that Cornwell had directed Snapper to commit a campaign contribution felony by asking Cornwell's friends and family to contribute money to the John Gilmore for Senator and Hillary Clinton for President campaigns and by then reimbursing those who made the campaign contributions with Cornwell's funds.

At the close of the evidence, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).[1]  The motion was a broad-based challenge to the viability of various theories of liability for each of the plaintiffs' three New York state-law claims.  As Rule 50 permits, the District Court reserved decision on the motion and sent the case to the jury, thereby requiring the defendants to renew their Rule 50(a) motion with a Rule 50(b) motion post-judgment if the defendants wished that motion to be considered.  See Fed. R. Civ. P. 50(b).

Before releasing the jurors for their deliberations, the District Court instructed the jury on the law.  As relevant to this appeal, the District Court instructed the jury that any

---

[1] The defendants moved three days before the close of the evidence to file a brief in support of their Rule 50(a) motion in excess of the 20-page limit.  But it was not until the close of the evidence that the District Court granted that motion and considered the defendants' Rule 50(a) motion.

conduct that occurred prior to three years before the plaintiffs brought the suit -- that is, before October 13, 2006 -- and which did not continue thereafter could not support the plaintiffs' claims of professional negligence or breach of contract. That was because, the court explained, the statute of limitations under New York law for those claims was three years. The District Court gave no such instruction regarding the breach of fiduciary duty claim. Instead, the court instructed the jury that "[t]he statute of limitations . . . does not affect the claim for breach of fiduciary duty." And thus, given that instruction, the jury was permitted to rely on conduct that occurred outside the three-year window in finding a breach of fiduciary duty.

Also relevant to this appeal, the District Court instructed the jury that, in addition to any compensatory damages that the jury might award, the jury could award punitive damages for any conduct that it found was in breach of a fiduciary duty. The District Court further instructed the jury that, in order to award punitive damages, the jury would have to find that "the breach was intentional or deliberate, [or] occurred under aggravating or outrageous circumstances, including a fraudulent or evil motive or a conscious act that willfully and wantonly disregarded the plaintiffs' rights."

The jury returned a verdict in favor of the plaintiffs on all three claims: professional negligence, breach of contract,

and breach of fiduciary duty.[2]  The jury awarded the plaintiffs just shy of $28.6 million in compensatory damages -- $22,405,400 for breach of fiduciary duty, $3,479,045 for professional negligence, and $2,677,955 for breach of contract.  The jury also awarded the plaintiffs $22,405,400 in punitive damages for breach of fiduciary duty.

The verdict form was general.  It did not require the jury to explain which theory or theories of liability it had relied on in finding for the plaintiffs on the three claims.  Nor did the form require the jury to identify which theory or theories of liability it had relied on in awarding compensatory or punitive damages.

After trial, the plaintiffs petitioned the District Court for attorneys' fees and costs under Massachusetts General Laws Chapter 93A.  The plaintiffs had included a Chapter 93A claim in their operative complaint and the District Court had reserved decision on that claim until after trial.  The plaintiffs also requested an award of equitable forfeiture in the amount of the full value of all fees they had paid to the defendants over the course of their business relationship.  The District Court denied both requests.  See Cornwell Entm't, Inc. v. Anchin, Block & Anchin

_____

[2] The jury also returned a verdict against the defendants on the single counterclaim they had been asked to decide: unpaid fees. That counterclaim is not at issue in this appeal.

LLP ("Cornwell I"), No. 09-11708-GAO, 2013 WL 2367849 (D. Mass. May 28, 2013).

The District Court held that Chapter 93A was not applicable because New York law, not Massachusetts law, governed the plaintiffs' claims. Id. at *2-3. The District Court separately declined to order equitable forfeiture on the ground that the jury's large damages award likely included disgorgement of fees and that any further award would be inequitable. Id. at *3-4. The District Court subsequently entered judgment in accordance with the jury verdict and its decision on the plaintiffs' post-trial petition for an additional monetary award.

After judgment was entered, the defendants timely renewed their Rule 50(a) motion for judgment as a matter of law, pursuant to Rule 50(b). The District Court granted the Rule 50(b) motion in part and denied it in part. See Cornwell Entm't, Inc. v. Anchin, Block & Anchin LLP ("Cornwell II"), No. 09-11708-GAO, 2014 WL 1249047 (D. Mass. Mar. 25, 2014).

The District Court first agreed with the defendants' contention in the Rule 50(b) motion that several of the plaintiffs' theories of liability -- including, as relevant to this appeal, those based on the allegedly botched purchase of the Renaissance condo in Florida and the alleged mismanagement of the rental of the Fifth Avenue apartment -- could not support the jury's verdict on any of the three claims. Id. at *3-5. That was because, the

- 7 -

District Court held, those theories of liability accrued more than three years before the plaintiffs brought suit, and the statute of limitations for all three claims under New York law was three years.  Id. at *2-5.  In so holding, the District Court concluded that it had erred in instructing the jury that, under New York law, the breach of fiduciary duty claim was not subject to a three-year statute of limitations.  Id. at *2.

The District Court then turned to the issue whether the plaintiffs' allegations regarding the defendants' statements to the DOJ regarding Cornwell's campaign contributions, which were allegedly made within the three-year statute of limitations, could support the jury's verdict on the claim of breach of fiduciary duty.  The District Court accepted the defendants' argument, made in the Rule 50(b) motion, that those allegations could not support the verdict on that claim because the defendants were protected by a qualified privilege for any statements they made to the DOJ. Id. at *4.  And the District Court accepted that argument notwithstanding the plaintiffs' contention that the argument about qualified privilege was not raised in the defendants' Rule 50(a) motion and for that reason was waived and could not be considered at the Rule 50(b) stage.  Id. at *1.

Finally, the District Court also considered the defendants' argument that there was insufficient evidence to support a non-speculative finding of damages on the NetJets theory

- 8 -

of liability.  Id. at *5.  As to that argument, too, the District Court agreed with the defendants' contention in their Rule 50(b) motion, and so it held that the NetJets theory of liability could not support the jury's verdict on any of the three claims.  Id.

In partially granting the Rule 50(b) motion, the District Court did not hold that all of the plaintiffs' theories of liability failed as a matter of law.  The District Court nevertheless concluded that, because it could not determine from the general verdict form whether the jury had relied on the theories that were legally defective or on those that were not defective, a new trial was required.  Id. at *6.  And so the District Court vacated the jury verdict and ordered a new trial on the theories that remained, id., which the District Court later stated were "the administration of Garfield, investments, taxes, and Anchin's invoicing practices or non-practices, and the general handling and management of funds."

The plaintiffs decided not to retry the case.  They instead requested judgment in favor of the defendants on all the remaining theories of liability so that they could "proceed with their appeal."  The District Court granted that motion and entered judgment accordingly, and the plaintiffs now appeal.  The plaintiffs challenge various aspects of the District Court's Rule 50(b) decision, the District Court's decision denying the plaintiffs' post-trial petition for equitable forfeiture and for

attorneys' fees and costs pursuant to Chapter 93A, and other rulings by the District Court.  We address each challenged ruling in turn.

II.

We begin with the District Court's ruling, in partially granting the defendants' Rule 50(b) motion, that the defendants are subject to a qualified privilege for any reports they made to the DOJ regarding the campaign contribution activities.  We then consider the District Court's ruling, also made in partially granting the defendants' Rule 50(b) motion, that the statute of limitations for a breach of fiduciary duty claim under New York law is only three years, and that, as a result, certain of the plaintiffs' theories of liability are time-barred.  Last, we address the District Court's decision -- made, once again, in the course of partially granting the Rule 50(b) motion -- that the plaintiffs' NetJets theory of liability fails as a matter of law because there was insufficient evidence at trial that would support a non-speculative finding of damages on that theory.

Obviously, if the District Court's rulings on the defendants' Rule 50(b) motion are correct, then they must be affirmed and the jury verdict cannot be reinstated.  But it is arguably less clear what should happen if any of the plaintiffs' challenges to the District Court's rulings on the defendants' Rule 50(b) motion do have merit.  In particular, the parties disagree

as to whether, in that event, the verdict must be reinstated, either in whole or in part.  We first proceed to evaluate the merits of the District Court's decision, and we conclude that the District Court did err in one respect.  Accordingly, we also take up the question of what should happen to the verdict in consequence of this error.

**A.**

The plaintiffs contend that the District Court erred in accepting the defendants' argument that any statements they made to the DOJ regarding Cornwell's campaign contributions were subject to a qualified privilege and thus could not support the claim of fiduciary breach.  The plaintiffs contend that the District Court erred in this regard because the defendants waived the qualified privilege argument by failing to raise it in their Rule 50(a) motion.  We agree with the plaintiffs, and thus we reverse this aspect of the District Court's Rule 50(b) ruling.

A Rule 50(b) motion is styled a "renewed motion for judgment as a matter of law" and, "[a]s the name implies . . . is bounded by the movant's earlier Rule 50(a) motion."  Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008) (alteration in original) (quoting Correa v. Hosp. S.F., 69 F.3d 1184, 1196 (1st Cir. 1995)).  As a result, "[t]he movant cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its [Rule 50(a) motion]."  Id. (quoting Correa, 69 F.3d at 1196).

The reason for this strict rule is simple. It "is designed to prevent unfair surprise and to provide the responding party with an opportunity to correct any deficiencies in her proof" before the case is sent to the jury. Lynch v. City of Bos., 180 F.3d 1, 13 n.9 (1st Cir. 1999) (citing the Fed. R. Civ. P. 50(a) Advisory Committee Notes to the 1991 Amendment).

The District Court did not hold otherwise in addressing the qualified privilege argument that the defendants set forth in their Rule 50(b) motion. Rather, the District Court held that the qualified privilege argument was "adequately subsumed in the argument, made in the Rule 50(a) motion, that the reporting did not, as a matter of law, constitute a breach of fiduciary duty." Cornwell II, 2014 WL 1249047, at *1. And so the key question is whether the District Court's conclusion that the qualified privilege argument was made in the Rule 50(a) motion is supportable.

It is not clear from our precedent what standard of review we should apply in evaluating a trial court's determination that an argument made in a Rule 50(b) motion was preserved in a Rule 50(a) motion. See, e.g., Jones ex rel. U.S. v. Mass. Gen. Hosp., 780 F.3d 479, 487-88 (1st Cir. 2015) (holding that the trial court properly found that the plaintiff's Rule 50(b) arguments were not preserved in the plaintiff's Rule 50(a) motion, but not indicating what standard of review applied to that determination);

- 12 -

<u>Parker</u>, 547 F.3d at 12-13 (same). But whatever the standard of review -- de novo, abuse of discretion, or even clear error[3] -- the record makes clear in this case that the District Court erred in ruling that the defendants had preserved their qualified privilege argument in their Rule 50(a) motion.

The defendants devoted just one paragraph of their Rule 50(a) motion to challenging the plaintiffs' theory that the defendants breached a fiduciary duty to the plaintiffs by reporting Cornwell's campaign contributions to the DOJ. The paragraph reads:

> Plaintiffs contend that Defendants breached their fiduciary duties to Ms. Cornwell and CEI when they reported to the [DOJ] the conduct surrounding the campaign contribution reimbursement activity. As the evidence plainly reveals, this activity occurred not only after the Defendants had been terminated as Plaintiffs' business managers, but also after Plaintiffs had sued the Defendants. Clearly, at that point, any fiduciary obligations Defendants owed to Plaintiffs had been terminated. <u>See</u> <u>Vigoda</u> v. <u>DCA Productions Plus, Inc.</u>, 293 A.D.2d 265, 267, 741 N.Y.S.2d 20 (2002). Any information that was turned over to a third party pertaining to Plaintiffs was pursuant to a government subpoena. Thus, by definition, the act of reporting the activity to the government could not have constituted a breach of fiduciary duty.

The District Court did not specify where in this passage the argument in question is made, and the passage at no

_____

[3] No party contends that such a decision is entirely discretionary such that we cannot review it.

- 13 -

point makes any direct reference to a qualified privilege. In their briefs to us, the defendants contend that the argument is set forth in the line that reads: "by definition, the act of reporting the activity to the government could not have constituted a breach of fiduciary duty." But the defendants omit the fact that this line is introduced by the word "thus." That introductory word makes clear that this line is merely setting forth a conclusion to the argument that is set forth in the sentences that immediately precede it. And we do not see how any of those sentences could fairly be read to have made an argument for qualified privilege, nor did the defendants argue in their opening brief to us that any of those prior sentences did make such an argument. See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000) (arguments not made in a party's opening brief are waived).

At oral argument, the defendants offered an alternative argument. They contended that the sentence that reads, "[a]ny information that was turned over to a third party pertaining to Plaintiffs was pursuant to a government subpoena," preserved the qualified privilege argument by its reference to a "subpoena." But the defendants also conceded at oral argument that this sentence would have preserved only an argument that a qualified privilege attached to statements that were made in response to a subpoena. It is only statements made not in response to a

- 14 -

subpoena, however, to which the District Court's qualified privilege holding applied.  See Cornwell II, 2014 WL 1249047, at *4.[4]

To overcome their failure to preserve their qualified privilege argument in their Rule 50(a) motion, the defendants argue that the plaintiffs cannot "show any prejudice" from the District Court having considered that argument, even accepting that it was made for the first time after trial.  But the defendants cite no support for the seemingly novel proposition that a party must show prejudice in this context.  Cf. Hudson v. NeXus Worldwide Holdings, Ltd., 191 F.R.D. 318, 322 (D.C. Cir. 2000) ("It is true that many courts have noted that the princip[al] purpose of requiring [a] defendant to move for judgment prior to the verdict is to provide the plaintiff with a fair opportunity to cure any insufficiencies. Notwithstanding this purpose, no circuit has held that the failure to move at the close of the evidence is excused merely by showing that the non-movant would not be prejudiced." (citation omitted)); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (arguments not sufficiently developed on appeal are waived).[5]

_____

[4] The plaintiffs do not appeal the District Court's separate holding that the statements the defendants made in response to a subpoena were subject to an absolute -- not qualified -- privilege. See Cornwell II, 2014 WL 1249047, at *5.

[5] The only support we have found, on our own review, for the proposition that a party must show prejudice from a trial court's consideration of an argument made for the first time in a Rule 50(b) motion is a dissenting opinion from the Eleventh Circuit.

Moreover, we have no reason to assume that there was no prejudice, given that the plaintiffs -- at least arguably -- might have moved to reopen the evidence in order to introduce additional evidence on the DOJ theory of liability had they been aware of the defendants' argument that the defendants were subject to a qualified privilege for any statements they made to the DOJ regarding the campaign contributions. See Sweeney v. Westvaco Co., 926 F.2d 29, 41 (1st Cir. 1991) (refusing to look past waiver in the Rule 50 context where "[t]here [was] no good reason for [the defendant's] neglect," and where "[t]he unfairness [was] obvious and aggravated [in that case] by the fact that, at least arguably, [the plaintiff] might have tried to reshape her case" had the argument been made earlier). In fact, qualified privilege is an affirmative defense, see Jules Rabin Assocs., Inc. v. Landon, 345 N.E.2d 588, 588 (N.Y. 1976), and thus should have been asserted in the defendants' answer, see Fed. R. Civ. P. 8(c); Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994) ("Fed. R. Civ. P. 8(c) requires a party to affirmatively plead certain specified defenses, as well as 'any other matter constituting an avoidance or affirmative defense.' Affirmative defenses not so pleaded are waived." (quoting FDIC v. Ramírez-Rivera, 869 F.2d 624, 626 (1st Cir. 1989))). Yet, in this case,

See McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1267 (11th Cir. 2016) (Carnes, J., dissenting).

the argument was not raised until after the trial had ended, which makes us especially reluctant to excuse its late articulation for lack of prejudice.

The defendants also argue that we should affirm the District Court's ruling concerning the DOJ statements on a different ground: that the statements the defendants made to the DOJ regarding Cornwell's campaign contributions were true and thus could not support a breach of fiduciary duty claim under New York law. But even assuming true statements could not support the claim under New York law, the defendants also failed to make this argument in their Rule 50(a) motion. And, again, this failure is not one that in this case we may overlook, even had defendants made any argument as to why we should. If the plaintiffs had been aware of this argument prior to the case going to the jury, the plaintiffs, at least arguably, might have moved to reopen the evidence in order to introduce additional evidence to prove that the defendants' statements to the DOJ were false. See Sweeney, 926 F.2d at 41 (refusing to look past waiver in similar circumstances).[6]

---

[6] The plaintiffs do not argue that a "miscarriage of justice" would result were we not to look past their failure to preserve in their Rule 50(a) motion the qualified privilege argument or the argument regarding the truth of the statements they made to the DOJ. See Parker, 547 F.3d at 13 (noting that courts have discretion to look past waiver in the Rule 50 context where doing so would "prevent a 'miscarriage of justice'" (quoting Correa, 69

- 17 -

Thus, we reject the District Court's decision entering judgment as a matter of law for the defendants on the DOJ issue. In doing so, we make no judgment as to the merits of the defendants' argument that they did not breach a fiduciary duty in making statements to the DOJ. We simply hold that those arguments were not preserved in the defendants' Rule 50(a) motion and so could not provide a basis, post-verdict, for the District Court's holding rejecting the DOJ theory of liability as a matter of law. Whether the reversal of the District Court on this issue means the verdict should be reinstated is a separate question that depends, at least in part, on how we decide the plaintiffs' remaining challenges to the District Court's Rule 50(b) decision. And so we now address those challenges.

**B.**

The plaintiffs contend that the District Court also erred in partially granting the defendants' Rule 50(b) motion because the District Court wrongly concluded in doing so that some of the plaintiffs' theories of liability were barred by the statute of limitations applicable to the three claims that were tried. In reaching this conclusion, the District Court determined that it had been wrong to instruct the jury that the claim of fiduciary breach was not, like the claims for breach of contract and

---

F.3d at 1196)). Nor do we think, for the reasons we have already given, that such a miscarriage of justice would result.

professional negligence, subject to a three-year statute of limitations. But we conclude that the District Court committed no error in reversing course in this respect. And, moreover, we are not persuaded by the plaintiffs' contention that, due to other doctrines of New York law, the three-year statute of limitations poses no obstacle to the theories of liability that the District Court held were time-barred.

**1.**

The plaintiffs first contend that the District Court erred in holding that New York's statute of limitations for a breach of fiduciary duty claim is three years. Our review of this purely legal issue is de novo, see Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N.Am., LLC, 794 F.3d 200, 203 (1st Cir. 2015), and we agree with the District Court.

In ultimately concluding that the statute of limitations for breach of fiduciary duty under New York law is three years, the District Court relied on IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268 (N.Y. 2009). See Cornwell II, 2014 WL 1249047, at *3. There, New York's highest court explained that there is no "single statute of limitations" under New York law for breach of fiduciary duty claims, and that "the choice of the applicable limitations period depends on the substantive remedy the plaintiff seeks." IDT Corp., 907 N.E.2d at 272. "Where the remedy sought is purely monetary in nature," the New York Court of

Appeals went on to hold, the statute of limitations is three years, whereas where "the relief sought is equitable in nature, the six-year limitations period . . . applies."[7] Id. The District Court thus concluded that, under IDT Corp., the applicable statute of limitations for the breach of fiduciary duty claim at issue here is three years, as the relief sought at trial for the alleged breach of fiduciary duty was monetary in nature. Cornwell II, 2014 WL 1249047, at *3.

The plaintiffs contend that despite IDT Corp.'s clear holding, "a fiduciary duty claim seeking damages is subject to a six-year limitations period if the claim has its genesis in the parties' contractual relationship." But we are not persuaded by the non-binding case law that the plaintiffs point to in support of this proposition, as those cases either themselves pre-date IDT Corp. or rely on other cases that pre-date IDT Corp. Nor do the plaintiffs dispute that the relief they sought at trial was monetary in nature. We thus conclude that IDT Corp. requires us to hold, as the District Court did, that the statute of limitations for the breach of fiduciary duty claim is three years.

---

[7] The New York Court of Appeals did provide an exception where "an allegation of fraud is essential to a breach of fiduciary duty claim," in which case a six-year statute of limitations applies. IDT Corp., 907 N.E.2d at 272. But the plaintiffs do not argue that the fraud exception is applicable here.

- 20 -

The plaintiffs next contend that, even assuming the statute of limitations under New York law for breach of fiduciary duty is, like the statute of limitations for breach of contract and professional negligence claims, only three years, that shorter statute of limitations is not as consequential as the District Court concluded that it was. To make this argument, the plaintiffs rely on New York's "continuous representation doctrine." They contend that this doctrine renders timely those theories of liability (whether for breach of contract, professional negligence, or fiduciary breach) that are based on the alleged mismanagement of the real estate transactions involving the Renaissance condo and the Fifth Avenue apartment, even though these transactions occurred outside the three-year statute of limitations that applies to those claims.

In partially granting the Rule 50(b) motion, the District Court rejected that argument on the ground that the continuous representation doctrine does not function in the way that the plaintiffs contend that it does. Cornwell II, 2014 WL 1249047, at *3. Reviewing the District Court's interpretation of this aspect of New York law de novo, see Quality Cleaning Prods. R.C., Inc., 794 F.3d at 203, we agree with the District Court.

Contrary to the plaintiffs' contention, New York's continuous representation doctrine does not automatically toll the

statute of limitations for the entire period of those professional relationships to which it applies. Rather, that doctrine tolls the statute of limitations "only so long as the defendant continues to advise the client in connection with the particular transaction which is the subject of the action and not merely during the continuation of a general professional relationship." Booth v. Kriegel, 36 A.D.3d 312, 314 (N.Y. App. Div. 2006); see also In re Lawrence, 23 N.E.3d 965, 980 (N.Y. 2014) (holding that the continuous representation doctrine tolls the limitations period only during an "ongoing provision of professional services with respect to the contested matter or transaction" and does not apply "to a continuing general relationship between a client and professional").[8]

---

[8] The plaintiffs argue that "[a] long line of cases, which the trial court chose to ignore in its Rule 50(b) Order, recognizes that the limitations period for a breach of fiduciary duty claim will typically be tolled until either the fiduciary openly repudiates the relationship or the relationship otherwise ends, without any requirement that the claim concerns a 'particular transaction.'" The plaintiffs' argument concerns the fiduciary tolling rule, not the continuous representation doctrine. The District Court did not address the plaintiffs' fiduciary tolling argument below, which the plaintiffs made by citing to cases that applied the continuous representation doctrine, not the fiduciary tolling rule. Given the plaintiffs' limited development of a state-law issue that "raises complexities that defy an easy answer," "the district court was 'free to disregard'" that argument, and the argument "cannot now be 'resurrected on appeal.'" Coons v. Indus. Knife Co., 620 F.3d 38, 44 (1st Cir. 2010) (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999)).

- 22 -

The plaintiffs argue on appeal that if such a "particular transaction" is required, then the "'particular transaction' in this case would be" the plaintiffs' enlisting the defendants to "manage real estate in a manner that permitted Cornwell to complete Book of the Dead." This argument does have some initial appeal, assuming this professional relationship is of a kind to which the doctrine applies at all.[9] The continuous representation doctrine was adopted in part on the understanding that someone who becomes aware of an error should not be required to sue immediately since that would only "interrupt corrective efforts." Borgia v. City of N.Y., 187 N.E.2d 777, 779 (N.Y. 1962). And, arguably, if the defendants were obliged to find Cornwell a place in which she could complete Book of the Dead, a requirement that the plaintiffs bring suit after any particular real estate transaction had occurred would interrupt corrective efforts by the defendants to find a suitable place for Cornwell to write that book.

But the plaintiffs did not make this argument to the District Court. The plaintiffs argued only that the continuous representation doctrine tolled the limitations period for the entirety of the "[d]efendants' mismanagement of real estate," and not for the shorter period of the defendants' mismanagement of

---

[9] The defendants do not challenge the doctrine's application to real estate services but the plaintiffs have not identified any case applying the doctrine to such services, and our own review has not turned up any such case.

handling the plaintiffs' real estate in a manner that would permit Cornwell to complete Book of the Dead. Because the plaintiffs failed to argue below that the particular transaction to which the continuous representation doctrine applied was the defendants' management of the plaintiffs' real estate in a manner that would permit Cornwell to complete Book of the Dead, that argument "cannot be surfaced for the first time on appeal." McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991); see also Rocafort v. IBM Corp., 334 F.3d 115, 122 (1st Cir. 2003) ("[A] party has a duty 'to incorporate all relevant arguments in the papers that directly address a pending motion.'" (quoting CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1526 (1st Cir. 1996))).

Moreover, we are skeptical that, assuming that the plaintiffs enlisted the defendants to manage the plaintiffs' real estate in a manner that permitted Cornwell to complete Book of the Dead, and assuming further that the defendants therefore participated in the kind of particular transaction to which New York's continuous representation doctrine applies, the plaintiffs' real-estate-related claims would thus be rendered timely by that doctrine. The evidence at trial was that the defendants fulfilled any obligation to manage the plaintiffs' real estate in a way that permitted Cornwell to complete Book of the Dead more than three years before this suit was brought. Specifically, Cornwell does not dispute what the evidence appears to show, which is that the

defendants had secured her a property where she could write as of August 2006, namely the "Monument" property. The evidence further shows that she resided there in 2007, when she completed her book. And while the evidence shows that there were problems with the Monument property in 2008 and 2009, the book was completed in 2007.

We thus affirm the District Court's decision that the statute of limitations applicable to the plaintiffs' fiduciary duty claim under New York law is three years and that the plaintiffs' theories of liability based on the Renaissance condo and the Fifth Avenue apartment are not made timely by New York's continuous representation doctrine.

## C.

The plaintiffs' last challenge to the District Court's ruling partially granting the Rule 50(b) motion concerns the District Court's decision that, on this record, only "conjecture or speculation" could support a finding of damages on the NetJets theory of liability. See Cornwell II, 2014 WL 1249047, at *5. Our review of the District Court's ruling about the lack of evidentiary support for this theory of liability is de novo, though we must construe all reasonable inferences from the trial record in the light most favorable to the plaintiffs. Malone v. Lockheed Martin Corp., 610 F.3d 16, 19-20 (1st Cir. 2010).

The plaintiffs contend that they introduced evidence at trial from which a juror could reasonably find that the plaintiffs

were due $532,000 in damages on account of Snapper's mismanagement of the contracts with NetJets for fractional ownership in a private jet. The plaintiffs point to Gruber's testimony that, four years after Snapper negotiated the contract with NetJets, she managed to negotiate "a five-year contract with [NetJets with] savings of $232,000 and 'perks' worth over $300,000, for a total value of $532,000."

But there was no evidence at trial regarding whether Snapper could have negotiated the same deal four years earlier. In fact, the evidence suggested the conditions were markedly different at the time Gruber reached her deal. The evidence at trial was that the economy went into a recession between when Snapper negotiated with NetJets and when Gruber negotiated with NetJets and that Gruber's contract with NetJets was for a smaller plane than the one Cornwell had requested four years earlier, when Snapper negotiated the contract. And so we agree with the District Court that only speculation could permit a reasonable juror to calculate an estimate of damages from Snapper's alleged mismanagement of the contract with NetJets by comparing the value of Gruber's contract with NetJets to the value of Snapper's contract.

## D.

Having resolved all of the plaintiffs' challenges to the District Court's Rule 50(b) decision, and having found in the

plaintiffs' favor on only one of those challenges -- the challenge to the ruling that a qualified privilege applies to the statements the defendants made to the DOJ -- we now must decide what to do about the jury verdict. The plaintiffs suggested in their briefing that we should remand for a new trial rather than reinstate the verdict. The defendants agreed and argued that the plaintiffs had waived any argument to the contrary.

At oral argument, however, the plaintiffs for the first time raised the possibility that, if we reversed the District Court's Rule 50(b) qualified privilege holding, then we could reinstate the jury's verdict that there was a breach of fiduciary duty, and then remand for a new trial on damages on that claim only. The plaintiffs reasoned that they had argued for punitive damages during closing argument with respect to only the DOJ investigation theory of breach of fiduciary duty. Thus, because the jury awarded punitive damages, the plaintiffs suggested, it must be the case that the jury found a breach of fiduciary duty with respect to that theory.

But we do not believe this late-breaking contention provides a basis for us to reinstate any portion of the jury's verdict. The plaintiffs' argument that the jury verdict on liability be reinstated was not included in the plaintiffs' opening brief, see Waste Mgmt. Holdings, Inc., 208 F.3d at 299 (an argument not included in an opening brief is waived), nor was it developed

on appeal, see Zannino, 895 F.2d at 17 (arguments not sufficiently developed on appeal are waived).  On the merits, moreover, we cannot be "reasonably sure" that the jury relied on a theory of liability that does not fail as a matter of law in finding for the plaintiffs on the fiduciary duty claim, as opposed to the various other theories that do fail as a matter of law.  See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 30 (1st Cir. 2004) (explaining that "we have generously applied the harmless error concept to rescue verdicts where we could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support" rather than a theory that failed as a matter of law).

The trial in this case spanned twenty-six days and involved a number of theories of liability.  No effort was made by the plaintiffs to indicate to the jury that certain theories and not others applied to certain claims, and nothing about the verdict form suggested to the jury that the claims were so limited.  It is also not clear to us from the record that the theories of liability that fail as a matter of law were less supported by the evidence than the other theories of liability such that we can conclude that the jury did not rely on the former in finding for the plaintiffs on the breach of fiduciary duty claim.  See id. (explaining that the harmless error concept applies to rescue general verdicts because we "[r]ecogniz[e] that a jury is likely to prefer a better supported theory to one less supported").

Nor are we convinced by the plaintiffs' argument that the jury's punitive damages award shows that the jury found a breach of fiduciary duty with respect to the DOJ investigation issue. The jury was not instructed that it could award punitive damages only on the basis of that theory of liability. Rather, the jury was instructed that it could award punitive damages for any conduct that it concluded was in breach of a fiduciary duty if it found "the breach was intentional or deliberate, [or] occurred under aggravating or outrageous circumstances, including a fraudulent or evil motive or a conscious act that willfully and wantonly disregarded the plaintiffs' rights."

To be sure, the plaintiffs are correct that their trial counsel limited her punitive damages argument at the end of trial to the DOJ issue. But parties' closing arguments are not evidence, as the jury in this case was instructed. There also was no more focus, in the presentation of the evidence, on the "intentional" or "aggravating or outrageous" nature of the breach with respect to the DOJ investigation than with respect to the other theories of liability, such that we can be "reasonably sure" that the jury's award of punitive damages was an award for the DOJ issue. See id.

In fact, consistent with the District Court's general instruction on punitive damages, the plaintiffs argued before the District Court that the jury's large punitive damages award was supported not only by the DOJ investigation theory of liability,

but also by "the entire breadth of Defendants' blatant violations of their fiduciary duties, such as: concealing fees they paid themselves, repeatedly mismanaging Plaintiffs' real estate and investment accounts, and -- in dealing with Plaintiffs' service providers -- putting their own interests before Plaintiffs' [interests]." And the plaintiffs opposed the defendants' argument that the "only ground for punitive damages [was the defendants'] disclosures to the DOJ," insisting to the District Court that such an argument "rings hollow." In light of that contention below, we do not see how we can say, especially with no briefing from the parties, that we are reasonably sure that the punitive damages award indicates that the jury found that the defendants were liable for breach of fiduciary duty with respect to the DOJ issue simply because the plaintiffs' trial counsel limited her closing argument to the jury regarding punitive damages to that issue.

We thus conclude that our "usual[]" approach is the correct one in this case. Id. at 29. Under that approach, where "a single verdict question encompasses multiple theories, one of which is defective," "a new trial is usually warranted." Id. at 29-30 (quoting Kerkhof v. MCI WorldCom, Inc., 282 F.3d 44, 52 (1st Cir. 2002)).[10]

_____

[10] We reject the plaintiffs' request that they be permitted to retry not just the DOJ issue, but also any theory of liability that remained after the District Court rendered its decision on the defendants' Rule 50(b) motion. The plaintiffs waived their

- 30 -

The plaintiffs' next challenge concerns the District Court's denial of their post-trial petition for reasonable attorneys' fees and costs under Massachusetts General Laws Chapter 93A and for equitable forfeiture. The District Court ruled on that petition almost a year before the District Court granted the defendants' Rule 50(b) motion. In doing so, the District Court held that the plaintiffs' claim under Massachusetts General Laws Chapter 93A was "inapplicable" to this case. See Cornwell I, 2013 WL 2367849, *4. The plaintiffs challenge that decision. The plaintiffs also challenge the District Court's denial of their request for equitable forfeiture. We take each argument in turn.

**A.**

The District Court concluded that Chapter 93A was not applicable to this case for two reasons. First, the District Court held that it was "inconsistent and illogical" for the plaintiffs to argue that New York law applied to "all the other claims" while at the same time contending that "Massachusetts law also applies, simply because it offers distinctive remedies." Id. at *1. The District Court separately held that "[e]ven if the plaintiffs'

---

right to try those remaining theories when they requested that the District Court enter final judgment for the defendants on those theories. See Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (defining waiver as "an intentional relinquishment or abandonment of a known right or privilege").

positions were not inconsistent . . . conventional choice-of-law analysis would yield the same result." Id. at *2. Applying Massachusetts's choice-of-law framework, the District Court held that New York law, and not Massachusetts law, applied to all the plaintiffs' theories of Chapter 93A liability. Id. at *2-3. As a result, the District Court held, the Chapter 93A claim could not proceed and so could not provide a basis for awarding the plaintiffs the costs and attorneys' fees that they requested. Id. at *3.

The plaintiffs' sole argument against this ruling on appeal is that "[t]he states' relative interest in the adjudication of the claims is a paramount factor" in Massachusetts' choice-of-law analysis, and that "Massachusetts' interest in ensuring that its consumer residents are protected against unfair acts or practices of out-of-state product and service providers surely outweighs New York's interest in protecting a local accounting firm from its own willful, wanton or egregious malfeasance in providing services to Massachusetts residents." For that reason, the plaintiffs contend, Massachusetts law governs the conduct they identified as violating Chapter 93A.

But the plaintiffs do not challenge the District Court's decision to analyze the Chapter 93A claim as a claim sounding in tort and contract. In determining which state's law governs claims that sound in contract, Massachusetts courts consider "a variety

of factors," <u>Bushkin Assoc., Inc.</u> v. <u>Raytheon Co.</u>, 473 N.E.2d 662, 668 (Mass. 1985), including "the place of contracting," "the place of negotiation of the contract," "the place of performance," "the location of the subject matter of the contract," and "the domicil, residence, nationality, place of incorporation and place of business of the parties," <u>id.</u> at 669 (quoting Restatement (Second) Conflict of Laws § 188 (1971)).  And where claims sound in tort, Massachusetts courts consider, among other things, "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicil, residence, nationality, place of incorporation and place of business of the parties," and "the place where the relationship, if any, between the parties is centered."  <u>Cosme</u> v. <u>Whitin Mach. Works, Inc.</u>, 632 N.E.2d 832, 834-35 & n.3 (Mass. 1994) (quoting Restatement (Second) Conflict of Laws § 145 (1971)); <u>see also</u> <u>Robidoux</u> v. <u>Muholland</u>, 642 F.3d 20, 25 (1st Cir. 2011) (explaining that although, "[h]istorically, in tort cases, Massachusetts applied the substantive law of the state where the alleged wrong occurred . . . Massachusetts has moved to a 'functional' approach for addressing choice of law issues" under which it assesses "various choice-influencing considerations, including those provided in the  Restatement (Second) of Conflict of Laws (1971)").

Thus, the plaintiffs' residence is just one factor among many that Massachusetts courts consider in determining which state

has the most significant relationship to a claim sounding in contract or tort. And, in this case, the other factors generally do not support the conclusion that Massachusetts law applies here. The plaintiffs do not dispute the District Court's findings that the defendants are located in New York, that the contract between the parties was negotiated and executed in New York, and that the relationship between the parties was centered in New York. See Cornwell I, 2013 WL 2367849, at *2-3. Moreover, most of the plaintiffs' theories of liability are based on events that occurred in New York or Florida, not in Massachusetts.[11]

Given that the plaintiffs make no developed argument on the choice-of-law issue beyond the contention that their residence in Massachusetts requires the application of Massachusetts law, we need go no further. See Zannino, 895 F.2d at 17. The plaintiffs have not made the case that the District Court erred in the choice-of-law analysis it performed in rejecting the Chapter 93A claim.

---

[11] As for the one theory of liability that was based on events that occurred in Massachusetts -- the defendants' alleged mismanagement of the purchase and renovation of Cornwell's residence on Garfield Road in Concord, Massachusetts -- the District Court held that even if Massachusetts law applied to that theory of liability, there was no evidence at trial that the defendants "acted in any unethical or deceptive way with respect to [that] renovation project" such that the defendants' conduct could be said to violate Chapter 93A. Cornwell I, 2013 WL 2367849, at *3. The plaintiffs do not challenge that alternate holding.

**B.**

The plaintiffs' argument that the District Court erred in denying their post-trial petition for an award of equitable forfeiture is also unavailing. The plaintiffs contend that the jury verdict "compel[s]" an award of equitable forfeiture in this case. But because we have concluded that the verdict cannot be reinstated, we cannot say that the verdict compels any such award. We note, however, that after the District Court vacated the verdict below, it held that "the question of whether equitable forfeiture is appropriate is left open for [re]trial." The defendants make no argument that the same should not be true upon remand from this appeal, and we see no reason why it should not.[12]

**IV.**

Notwithstanding that we are not reinstating the verdict, we must address two additional issues. Each pertains to any new trial that may occur. The first concerns the counsel who may participate in it. The second concerns whether certain records from the first trial may be unsealed.

---

[12] We need not address whether the District Court's post-trial award of interest on the jury verdict was erroneous, as the plaintiffs ask us to address that issue only in the event that we reinstate the jury verdict, which we have not done. Nor need we reach the defendants' argument that the District Court erred in not instructing the jury on comparative causation. The parties are free to raise the issue whether a jury instruction on comparative causation is warranted in this case in the event there is a new trial.

## A.

We start with the plaintiffs' contention that Sidley Austin LLP, the defendants' counsel at present, should not be permitted to continue to represent the defendants on remand. The plaintiffs moved below to "disqualify" Sidley as counsel for the defendants "or, in the alternative for expedited discovery to determine whether such disqualification is mandated and/or for an evidentiary hearing regarding [the] same." The plaintiffs request that we "[r]einstate[]" that motion and order the District Court, on remand, to permit discovery on the issue prior to retrial.

"Because the district court is vested with the power and responsibility of supervising the professional conduct of attorneys appearing before it," we review the District Court's decision regarding disqualification of counsel for an abuse of discretion. Kevlik v. Goldstein, 724 F.2d 844, 847 (1st Cir. 1984). That same standard applies to a trial court's decision regarding discovery and whether to hold an evidentiary hearing. See Braga v. Hodson, 605 F.3d 58, 59 (1st Cir. 2010) (discovery); Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 527 (1st Cir. 1991) (evidentiary hearing). We conclude that there was a "reasonable basis" for the District Court's decision and thus that there was no abuse of discretion in this case. Kevlik, 724 F.2d at 847.

The plaintiffs sought to disqualify Sidley on the ground that James Cole had recently joined that firm as partner and that Cole had previously served as Deputy Attorney General of the United States. As Deputy Attorney General, the plaintiffs contended, Cole likely obtained information regarding the DOJ investigation of Anchin and Cornwell. Thus, the plaintiffs contended, Sidley, due to Cole's membership in the firm, gave the defendants a "strategic advantage" with respect to any issues in the case concerning the DOJ investigation. That advantage, the plaintiffs argued to the District Court, required that Sidley be disqualified as counsel under both Federal Rule of Criminal Procedure 6 and Massachusetts Rule of Professional Conduct 1.11.

The District Court held that the plaintiffs' argument that Cole had received information about the Anchin and Cornwell investigation while at the DOJ relied on "speculation" and was contradicted by a sworn affidavit submitted by Cole. We see no grounds for reversing that ruling.

Cole states in his affidavit that "[a]t no time -- either while [his] nomination was pending, after [he] was sworn in, or at any point thereafter -- did [he] receive any confidential government information relating to the investigation into the campaign bundling scheme involving Anchin and Patricia Cornwell." Thus, notwithstanding the plaintiffs' contention that "the investigation" did not include "what happened at the Grand Jury,"

Cole's statement that he received no information "<u>relating</u> to the investigation" indicates that he did not receive any information concerning what happened at the grand jury.  Moreover, one of the defendants' exhibits below -- an email that appears to have been circulated at the DOJ -- indicates that Cole was "recused" from "all matters that involve, or have a direct and predictable effect on" Anchin.  The plaintiffs do not explain why such a broadly-worded recusal would not extend to obtaining information concerning grand jury proceedings.

This evidence indicates that Cole had no exposure to the information that the plaintiffs contend requires his firm's disqualification.  The plaintiffs therefore appear to rely on nothing more than speculation in contending that Cole might have been involved in the DOJ investigation of Anchin and Cornwell.  We thus conclude that the District Court did not abuse its discretion in denying the plaintiffs' motion.

**B.**

We come, then, to the final issue on appeal.  The plaintiffs have asked us to order the District Court to permanently seal certain trial court records that the District Court ordered be unsealed.  We review the District Court's decision to unseal the records in question "only for mistake of law or abuse of discretion," and we give the District Court "considerable leeway

- 38 -

in making [such a] decision[]."  Siedle v. Putnam Invests., Inc.,
147 F.3d 7, 10 (1st Cir. 1998).

**1.**

We begin with the relevant background.  After the trial,
two jurors, after hearing media reports about the size of the jury
award in this case, notified the District Court that the jury had
intended to award a smaller amount of damages.  The District Court
held a hearing at which it questioned the two jurors separately
under oath.  Each juror testified that the jury had agreed to award
the plaintiffs a total of approximately $28.6 million in damages,
not $51 million.  The jury had erred, the two jurors testified, in
awarding $22.4 million for the fiduciary duty claim for both
compensatory damages and for punitive damages, because the jury
had actually intended to award $22.4 million on that claim for
compensatory and punitive damages combined.

In light of that testimony, the District Court
determined that the damages award on the verdict form did not
reflect the jury's agreement as to damages, and that the jury
intended to award $28.6 million, not $51 million.  But the District
Court nevertheless concluded that it could not amend the judgment.
That was because, the District Court held, it was barred from
considering the jurors' testimony under Federal Rule of Evidence
606(b), which prohibits a juror from testifying, "[d]uring an
inquiry into the validity of a verdict," "about any statement made

or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict."[13]  The District Court concluded that "further juror inquiry regarding the discrepancy is inappropriate, and the jury verdict will not be altered on account of the discrepancy."

The District Court then ordered that the records relating to the question of the jury verdict -- the transcript of the jurors' testimony, the parties' briefing, and the District Court's decision on the issue -- remain under seal until the later of 28 days after entry of final judgment or the entry of any order disposing of any motion under Federal Rules of Civil Procedure 50(b), 52(b), 59, or 60.  This Court ordered, however, that the materials remain sealed "pending further order of this court," and asked the parties to brief the issue whether the records should remain sealed.

---

[13] The District Court acknowledged that Rule 606(b) provides an exception for testimony about "a mistake . . . made in entering the verdict on the verdict form," see Fed. R. Evid. 606(b)(2)(C), but held that the exception did not apply in this case.  The District Court stated that "the discrepancy" between what the jurors discussed and decided on damages and what they put on the verdict form was "likely the result of a misunderstanding or misinterpretation by the jury or its foreman of either the Court's instructions or the verdict form, or both, and not the result of a simple clerical error in the recording of the verdict."

"The common law presumes a right of public access to jury records."[14]  Siedle, 147 F.3d at 9.  This presumption "stems from the premise that public monitoring of the judicial system fosters the important values of 'quality, honesty and respect for our legal system.'"  Id. at 9-10 (quoting FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir. 1987)).  "The presumption extends to records of civil proceedings."  Id. at 10.

In this case, the plaintiffs contend, those values run up against another value: the sanctity of jury deliberations.  See, e.g., United States v. Olano, 507 U.S. 725, 737 (1993) (referring to "the cardinal principle that the deliberations of the jury shall remain private and secret" (quoting the Advisory Committee Notes to Fed. R. Crim. Proc. 23(b))); Cabral v. Sullivan, 961 F.2d 998, 1001-02 & 1001 n.3 (1st Cir. 1992) (discussing the "sanctity of the jury" in civil trials).  The plaintiffs argue that the sanctity of the jury deliberations regarding the damages award in this case outweighs the interest the public has in access to the information in question.

We cannot say, however, that the District Court abused its discretion in concluding otherwise.  First, "[t]he primary if

---

[14] The defendants do not argue that sealing the records would violate any public right to access to judicial materials under the First Amendment.  And so we do not consider that issue.  See Siedle, 147 F.3d at 9 n.4 (taking the same approach).

not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence." Olano, 507 U.S. at 737-38. This purpose is not implicated here, where the testimony at issue was received after the jury had finished deliberating and was not considered by the District Court in evaluating the validity of the verdict. Cf. In re Globe Newspaper Co., 920 F.2d 88, 91 (1st Cir. 1990) (stating that "stronger reasons to withhold juror names and addresses will often exist during trial than after a verdict is rendered").

Nor do we agree with the plaintiffs that Rule 606(b) -- the Rule the District Court cited in concluding that it could not consider the jurors' testimony in evaluating the validity of the verdict -- requires that the records be sealed. That Rule does not state that if the District Court receives juror testimony and then determines that it may not consider it in adjudging the validity of the verdict -- as was the case here -- the court must seal the testimony that it received. In fact, the Advisory Committee Notes to the Rule expressly note that the Rule "does not relate to secrecy and disclosure but to the competency of certain witnesses and evidence." Consistent with that statement, at least two other circuits have quoted in published opinions juror testimony even where they concluded, as the District Court did here, that Rule 606(b) prohibited the trial court from considering that testimony in evaluating the validity of the verdict. See

Munafo v. Metro. Transp. Auth., 381 F.3d 99, 102-04 (2d Cir. 2004); Robles v. Exxon Corp., 862 F.2d 1201, 1203-04 (5th Cir. 1989).

The plaintiffs' last argument is that the records at issue should be sealed to avoid "embarrass[ing] the judge and the jury." But "[t]he mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access" to judicial records. Siedle, 147 F.3d at 10.

## 3.

In sum, the District Court did not abuse its discretion in ordering the records at issue unsealed in this case. We leave the question whether the two jurors' names should be redacted from the relevant records for the District Court to decide in the first instance.

## V.

The District Court's decision is **affirmed in part**, **reversed in part**, and **remanded** for further proceedings consistent with this opinion. Each party shall bear its own costs.